## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Steven Watts, | ) | C/A No.: 1:17-127-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I.  Relevant Background

A.  Procedural History

On March 26, 2013, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on September 19, 2012. Tr. at 118, 119, 201–07, and 208–16. His applications were denied initially and upon reconsideration. Tr. at 150–54, 157–58, and 159–60. On August 14, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Colin Fritz. Tr. at 44–95 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 14, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 22–39. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 17, 2017. [ECF No. 1].

B.  Plaintiff's Background and Medical History

1.  Background

Plaintiff was 47 years old at the time of the hearing. Tr. at 48. He completed the ninth grade. Tr. at 51. His past relevant work ("PRW") was as a forklift operator and general production worker. Tr. at 52–53 and 81–82. He alleges he has been unable to work since September 19, 2012. Tr. at 48.

2. Medical History

Plaintiff regularly visited pain management physician Robert LeBlond, M.D. ("Dr. LeBlond"), for treatment of low back pain and medication refills from October 5, 2011, through September 13, 2012. *See* Tr. at 654–74.

Plaintiff was admitted to Greenville Memorial Hospital ("GMH") on September 19, 2012, following a rollover motor vehicle accident ("MVA").[2] Tr. at 301. He sustained fractures to multiple ribs, the L2 to L5 spinous process, the L1 to L5 transverse process, the acetabulum, the inferior rami, the left femur, the right tibial plateau, and the right great toe. Tr. at 304. He underwent open reduction and internal fixation ("ORIF") of his right actetabulum and lateral tibial plateau and intermedullary nailing of his left femur. *Id.* His recovery was complicated by development of an ileus and deep venous thrombosis. *Id.* Plaintiff participated in physical therapy during his recuperation period and was transferred to Roger C. Peace Rehabilitation Hospital ("RCPRH") for additional intensive rehabilitation on October 10, 2012. Tr. at 304–05.

Plaintiff participated in inpatient rehabilitation at RCPRH from October 10, 2012. Tr. at 440. He received a therapeutic dose of Coumadin and his blood pressure medication was adjusted to address hypertension. *Id.* His pain was well-controlled with OxyContin and Roxicodone, and he made good progress with physical therapy. *Id.* On

---

[2] Plaintiff was intoxicated at the time of the accident. Tr. at 307. The record contains conflicting evidence as to whether he was the driver or passenger of the vehicle. *See* Tr. at 301 ("SW received [sic] consult for pt admitted [sic] 9/19/12 after a rollover MVA where pt was the driver"); Tr. at 362 "FELONY DRIVING UNDER THE INFLUENCE ADVISEMENT"); Tr. at 651 ("His stepson was driving and both of them were injured severely.").

October 26, 2012, Plaintiff was discharged to his sister's home, where 24-hour care was to be provided. *Id.* At the time of discharge, he was instructed to remain non-weight bearing on his legs and his left hand, but was able to perform modified independent transfer from his wheelchair. *Id.*

Plaintiff presented to GMH with a right gluteal abscess on November 1, 2012. Tr. at 550. The abscess was drained, and Plaintiff was instructed to follow up in the Green Surgery Clinic in one week. Tr. at 553 and 563.

Plaintiff presented to Richard William Gurich, Jr., M.D. ("Dr. Gurich"), for follow up on the abscess on November 6, 2012. Tr. at 614. He complained of chronic pain in his back, chest, hips, and knees. *Id.* He indicated the right gluteal abscess was healing with no further signs of infection, but reported a new abscess on his left posterior thigh. *Id.* Dr. Gurich observed the right buttock abscess to be healing well. Tr. at 615. He expressed purulence and decompressed the abscess on Plaintiff's left posterior thigh. *Id.* He instructed Plaintiff to complete his course of Bactrim and to soak in warm water as needed. *Id.*

Plaintiff followed up with Mark Zelickson, M.D. ("Dr. Zelickson"), regarding the abscesses on November 13, 2012. Tr. at 632. Dr. Zelickson indicated the wound on Plaintiff's right buttock was granulating and had no surrounding induration or erythema and the wound on his left thigh was nearly closed. *Id.* He noted that Plaintiff had limited mobility, but instructed him to turn frequently while in bed and to avoid sitting in his wheelchair for long periods. *Id.*

On November 16, 2012, John Scott Broderick, M.D. ("Dr. Broderick"), observed that Plaintiff had no tenderness in his distal radius, full pronation and supination, and flexion and extension reduced by 10 degrees in his left upper extremity. Tr. at 628. Plaintiff had only slightly decreased range of motion ("ROM") in his left lower extremity. Tr. at 628–29. He was neurovascularly intact and had no signs of infection in his right lower extremity. Tr. at 629. His x-rays were consistent with healing fractures. *Id.* Dr. Broderick removed Plaintiff's cast and instructed him to bear weight as tolerated on his left wrist. *Id.* He indicated Plaintiff should remain non-weight bearing on his bilateral lower extremities. *Id.*

Plaintiff presented to David Goldsmith, PA-C ("Mr. Goldsmith"), on December 10, 2012, for pain management. Tr. at 651. He reported pain in his shoulder and bilateral thighs and increased pain in his right lumbosacral area. *Id.* He endorsed generalized weakness in his lower extremities and numbness and tingling in his toes. *Id.* Mr. Goldsmith observed Plaintiff to be seated in a wheelchair. *Id.* He noted Plaintiff's back was tender along the right lumbosacral area, but that he had full ROM with dorsiflexion and plantar flexion of the feet, bilateral knee extension and flexion, and a negative straight-leg raising ("SLR") test. Tr. at 652. He observed Plaintiff to be able to stand, but indicated his posture was flexed. *Id.* Mr. Goldsmith refilled Plaintiff's prescriptions for Lortab 10/500 mg, Flexeril 10 mg, and Amitriptyline 100 mg. *Id.*

On December 14, 2012, x-rays revealed Plaintiff's hardware to be in good position and his fractures to be healing with no displacement. Tr. at 625. He complained of pain in his hip and knee, but stated he felt as if he were improving. *Id.* Plaintiff had intact

sensation and normal strength in his lower extremities, but had slightly decreased ROM in his left leg. *Id.* He had good strength and sensation in his left wrist, but his ROM was slightly decreased. Tr. at 625–26. Kyle Jeray, M.D. ("Dr. Jeray"), instructed Plaintiff to bear weight as tolerated and referred him back to RCPRH for additional therapy. Tr. at 626.

Plaintiff denied significant impairment and side effects from his medications on January 9, 2013. Tr. at 649. He rated his pain as a nine on a 10-point scale. *Id.* Dr. LeBlond refilled Plaintiff's medications and instructed him to follow up in four weeks. *Id.*

Plaintiff requested pain medication on February 8, 2013. Tr. at 622. He denied paresthesias, but complained of achiness in his right hip, left distal femur, and right shoulder. *Id.* Dr. Jeray observed Plaintiff to have positive Hawkins and Neer signs and to be tender to palpation in the subacromial space of his right shoulder. Tr. at 622–23. Plaintiff had external rotation to approximately 45 degrees and active abduction to 95 degrees with discomfort. Tr. at 623. His right hip incision was well-healed, and he denied pain with maximum internal and external rotation. *Id.* His left distal femur was tender to palpation at the fracture site, but he had no swelling or erythema. *Id.* Dr. Jeray assessed subacromial bursitis, administered a corticosteroid injection to Plaintiff's right shoulders, and prescribed Tramadol. *Id.* He instructed Plaintiff to continue to bear weight as tolerated. *Id.* He noted that Plaintiff was using a wheelchair to rest, but he encouraged him to continue to walk as much as possible. *Id.* He indicated Plaintiff was "pursuing disability" and did "not have current intentions to return to the work force." *Id.*

On February 19, 2013, Plaintiff complained of pain across his back and into his left thigh and leg and right hip and groin. Tr. at 646. He indicated he was doing fairly well with the increased medication dosage. *Id.* Mr. Goldsmith observed that Plaintiff was no longer in the wheelchair and was walking with a cane. *Id.* He noted that Plaintiff had no insurance and was having difficulty seeing some of his medical providers. *Id.* He indicated Plaintiff had good strength and sensation in his lower extremities; negative SLR test; antalgic gait; a half inch leg length discrepancy; tenderness along the facets and sacroiliac ("SI") joints; and restricted ROM with flexion, extension, and lateral rotation. *Id.* He adjusted Plaintiff's cane to a shorter position. *Id.* He refilled Plaintiff's prescription for Lortab 10/500 mg; advised him to stop taking Flexeril and to taper and discontinue Amitriptyline; and prescribed Ambien for sleep. Tr. at 647.

During a follow up visit on March 20, 2013, Plaintiff reported that he was sleeping much better since starting Ambien. Tr. at 644. He assessed his pain as between an eight and a 10, but indicated it was tolerable with medication. *Id.* Mr. Goldsmith refilled Plaintiff's prescriptions for Ambien 10 mg and Lortab 10/500 mg tablets. *Id.*

Plaintiff continued to endorse right shoulder pain on April 5, 2013, and Dr. Jeray referred him for magnetic resonance imaging ("MRI"). Tr. at 619.

On April 18, 2013, Plaintiff indicated his medication did not cause significant side effects or impair his judgment, coordination, or ability to drive. Tr. at 642. Plaintiff rated his pain as an eight on a 10-point scale. *Id.* Dr. LeBlond refilled Plaintiff's prescriptions for Ambien, Norco, Lisinopril, Chlorothalidone, and Klor-Con. *Id.*

Plaintiff complained of pain in his right hip, groin, left knee, and shoulder on April 19, 2013, but indicated it was satisfactorily controlled with medication. Tr. at 616. Dr. Goetz observed Plaintiff to have sensation intact to light touch, 5/5 strength from L2 through S1, and pain with internal and external rotation of the right hip and groin. *Id.* He noted Plaintiff had left knee extension reduced by 10 degrees, flexion to 130 degrees, and stability to varus and valgus stress. *Id.* He stated Plaintiff had good activation of the quads and minimal aching in the left thigh. *Id.* Plaintiff denied pain with flexion, extension, and prosupination of his left wrist. *Id.* He had intact strength and sensation in the left wrist, but lacked 10 degrees of extension and flexion. Tr. at 616–17. Dr. Goetz indicated the MRI of Plaintiff's right shoulder showed some mild glenohumeral osteoarthritis and some posterior labral fraying, but no cuff tear of massive labral pathology. Tr. at 617. He instructed Plaintiff to take an anti-inflammatory medication and offered him an intraarticular shoulder injection, but Plaintiff indicated he would prefer to follow up with his pain management physician for an injection. *Id.*

Plaintiff rated his pain as an eight on a 10-point scale and denied significant side effects from his medications on May 16, 2013. Tr. at 640. Dr. LeBlond refilled his medications. *Id.*

On June 14, 2013, Plaintiff reported that his pain was exacerbated by walking and better with rest. Tr. at 638. He endorsed chronic pain in his back, hip, and pelvis and intermittent numbness in his leg. *Id.* Dr. LeBlond observed Plaintiff to have an antalgic gait and slightly decreased deep tendon reflexes ("DTRs"), but intact sensation and negative straight-leg raising ("SLR") test. *Id.* He encouraged Plaintiff to continue to use

heat and home exercises, to fill his prescription for antidepressant medication, and to follow up with the county mental health center. Tr. at 639.

On July 17, 2013, Plaintiff denied side effects from medication and described his pain as a seven on 10-point scale. Tr. at 636. Dr. LeBlond refilled Plaintiff's prescriptions for Ambien and Norco and instructed him to continue to take Lisinopril, Chlorothalidone, and Klor-Con. *Id.* Plaintiff reported no change, and Dr. LeBlond refilled his medications on August 19, 2013. Tr. at 685.

On September 3, 2013, state agency medical consultant Joseph Geer, M.D. ("Dr. Geer"), reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment. Tr. at 102–04. He indicated Plaintiff had the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and reach overhead with the right upper extremity; frequently balance; and avoid even moderate exposure to hazards. *Id.* A second state agency medical consultant, Dale Van Slooten, M.D. ("Dr. Van Slooten"), assessed the same physical RFC on December 27, 2013. Tr. at 128–30.

Melissa A. Moore, M.D. ("Dr. Moore"), reviewed the evidence on September 3, 2013, and determined that Plaintiff had no medically-determinable mental impairment. Tr. at 99.

On September 16, 2013, Plaintiff indicated his pain was fairly well-controlled with medications, but stated he noticed numbness in his feet when he attempted to sleep. Tr. at

682. He reported pain in his right back and pelvic area and occasional pops in his hip. *Id.* Mr. Goldsmith observed that Plaintiff had an antalgic gait and a flexed back and demonstrated difficulty standing erect. *Id.* He advised Plaintiff to visit the South Carolina Department of Mental Health for depression and to follow up with a primary care physician for treatment of hypertension. *Id.*

Plaintiff described his pain as an eight on a 10-point scale and denied significant impairment from medications on October 24, 2013. Tr. at 680. Dr. LeBlond refilled his medications. *Id.*

Plaintiff presented to Sonya L. Cothran-Pate, FNP ("Ms. Cothran-Pate"), for Coumadin management on October 28, 2013. Tr. at 676. He reported depressed mood and indicated he desire to try another antidepressant because he did not like the way Citalopram made him feel. *Id.* Ms. Cothran-Pate noted that Plaintiff had gained 13 pounds since his last visit and his blood pressure was elevated at 160/100 mg/Hg. *Id.* She observed Plaintiff to have normal strength and tone in his upper and lower extremities. Tr. at 677. She prescribed Paroxetine HCl 20 mg for depression and advised Plaintiff to follow a low sodium diet and to lose weight. *Id.*

On November 22, 2013, Plaintiff rated his pain as an eight on a 10-point scale without medication, but indicated it was "acceptable with medications." Tr. at 678. Mr. Goldsmith observed Plaintiff to have good strength and sensation and equal DTRs in his lower extremities. *Id.* He noted Plaintiff had a mildly antalgic gait; tightness in his hamstrings in the standing position; difficulty with full extension; and walked with 20 to 30 degrees of forward flexion. *Id.* He indicated Plaintiff had facet pain with loading and

was tender in the lumber paraspinals. *Id.* Mr. Goldsmith noted Plaintiff had some deconditioning and encouraged him to engage in routine exercise and stretching. *Id.*

On December 27, 2013, state agency psychological consultant Larry Clanton, Ph. D. ("Dr. Clanton"), reviewed the record and considered Listings 12.04 for affective disorders and 12.09 for substance addiction disorders. Tr. at 126. He found that Plaintiff had mild restriction of activities of daily living ("ADLs"), no difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence, or pace. Tr. at 126–27. He concluded that Plaintiff's mental impairments imposed "minimal limitation on the ability to perform work tasks." Tr. at 127.

On February 16, 2015, Plaintiff presented to Ms. Cothran-Pate for a headache and hypertension. Tr. at 689. He reported that he had run out of his blood pressure medications eight months earlier. *Id.* He also complained of back pain, insomnia, and depression. *Id.* Ms. Cothran-Pate noted no significant abnormalities on physical examination. Tr. at 689–90. She referred Plaintiff to pain management for treatment of his chronic back pain. Tr. at 691.

Plaintiff presented to Christopher K. Broome, APRN ("Mr. Broome"), on April 13, 2015. Tr. at 696. He reported aching lower back pain that was accompanied by intermittent radicular symptoms in his right lower extremity. *Id.* He indicated his pain was "modestly relieved with medications and rest." *Id.* Mr. Broome recommended SI joint injections, but Plaintiff declined them because he had no insurance and did not believe they were financially feasible. *Id.* Mr. Broome informed Plaintiff that comprehensive pain management required a variety of treatment modalities and could not

be accomplished simply by increased doses of narcotic medications. *Id.* He indicated Plaintiff's last urine drug screen showed elevated metabolites of ethyl alcohol and informed Plaintiff that he should not be consuming alcohol while taking Norco. *Id.* Mr. Broome observed Plaintiff to have tenderness to the bilateral proximal trapezia and throughout his lumbosacral and SI spine. Tr. at 697. He noted no new focal or sensory deficits and normal DTRs. *Id.* He diagnosed lumbar joint disease and SI joint pain related to degenerative joint disease. *Id.* He refilled Plaintiff's prescription for Norco 7.5/325 mg and instructed him to take it every eight hours, as needed. *Id.* He also refilled Neurontin 300 mg and instructed Plaintiff to take one to two tablets every eight hours, as needed. *Id.*

On May 11, 2015, Plaintiff rated his pain as a four with medication and a seven without medication. Tr. at 698. He indicated his pain was only moderately relieved with medication and rest and was exacerbated by ambulation. *Id.* Mr. Broome noted tenderness in Plaintiff's bilateral proximal trapezia and throughout his lumbosacral and SI spine. *Id.* He stated Plaintiff had no new focal or sensory deficits, normal DTRs, and no reproduction or exacerbation of radicular symptoms during the examination. *Id.* He again recommended SI joint injections, and Plaintiff maintained that it was not financially feasible. Tr. at 699.

Plaintiff denied side effects from medication on June 12, 2015. Tr. at 700. Mr. Broome observed Plaintiff to be tender over his lumbar facet joints and SI joints bilaterally, but noted no other significant findings on physical examination. *Id.* He indicated Plaintiff's pain was uncontrolled. Tr. at 701.

On July 10, 2015, Plaintiff reported no change in his low back and right lower extremity pain. Tr. at 702. Mr. Broome noted that Plaintiff had "not yet procured medical benefits" and indicated that he might receive a greater benefit from treatment if he could obtain insurance coverage for therapeutic injections. *Id.* He observed diffuse tenderness over Plaintiff's bilateral lumbar facet joints and SI joints. *Id.* He stated Plaintiff's pain was moderately well-controlled and refilled Plaintiff's prescriptions for Norco and Neurontin. Tr. at 703.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 14, 2015, Plaintiff testified that he lived with his sister and her adult son. Tr. at 49. He indicated he had lost his home after the MVA. *Id.* He stated that the MVA resulted in implantation of a plate in his right hip and a rod in his left leg and fractures to his pelvis, knee, big toe, left wrist, and ribs. Tr. at 56–58. He endorsed back pain, but indicated it did not originate with the MVA. Tr. at 57. He reported some problems with his right shoulder. Tr. at 58.

Plaintiff testified that his hip pain was exacerbated by walking. Tr. at 58. He indicated he used a cane to ambulate most of the time, but denied that it had been prescribed. Tr. at 59. He stated his left leg felt weak, tingled, ached, and gave out at times. *Id.* He indicated his lower back would sometimes lock up, causing him to be unable to move. *Id.* He testified that his back pain radiated from his lower back through his bilateral legs. Tr. at 60–61. He stated he sometimes experienced pain in his big toe

during cold weather. Tr. at 61. He described his left wrist as constantly aching. *Id.* He quantified his pain as a three on a 10-point scale with medication and an eight without medication. Tr. at 67. He indicated his pain was exacerbated by cold weather. Tr. at 68.

Plaintiff testified that he could sit for 10 to 15 minutes before he had to shift positions to reduce his pain. Tr. at 63. He indicated he could stand for five-to-10 minutes while using a cane. Tr. at 64. He stated that his pelvis "pop[ped] out" if he walked too quickly. *Id.* He confirmed that he could walk for half-a-block to a block. Tr. at 65. He indicated he had to hold on to the rail and to take his time to climb stairs. Tr. at 66. He estimated he could lift five to 10 pounds. Tr. at 74.

Plaintiff stated he had been unable to obtain injections in his back because he could not afford them and did not have insurance. Tr. at 65–66. He endorsed difficulty sleeping because of pain and stress. Tr. at 76.

Plaintiff testified that his driver's license had been suspended many years prior for driving under the influence ("DUI"). Tr. at 55. He denied that he was driving the car when he was injured in the MVA in September 2012. Tr. at 56. He indicated he would occasionally drink alcohol with a friend. Tr. at 78.

Plaintiff stated his sister performed most of the household chores, did the laundry, and prepared meals, but that he would clean his room. Tr. at 70–71. He indicated he mowed the lawn with a riding mower, but it exacerbated his back pain. Tr. at 71. He stated he was able to dress himself and care for his personal needs, but needed to lean on something while showering. Tr. at 71–72. He indicated he occasionally went fishing with a friend for several hours. Tr. at 72. He testified that he had enjoyed hunting, pitching

horseshoes, and horseback riding prior to the MVA, but was no longer able to participate in those activities. Tr. at 73 and 75–76. He indicated he occasionally attended church and shopped for groceries with his sister. Tr. at 73–74.

b.    Vocational Expert Testimony

Vocational Expert ("VE") G. Roy Sumpter reviewed the record and testified at the hearing. Tr. at 79–94. The VE categorized Plaintiff's PRW as a forklift operator, *Dictionary of Occupational Titles* ("*DOT*") number 921.683-050, as medium with a specific vocational preparation ("SVP") of three and a general production worker, *DOT* number 529.686-070, as medium with an SVP of two. Tr. at 81–82. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that would require no more than four hours of standing and walking and six hours of sitting during an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; could frequently balance; could occasionally reach overhead with the right upper extremity; could occasionally be exposed to extreme cold and hazards associated with unprotected heights and dangerous machinery; and would be able to understand, remember, and carry out simple, routine tasks in a low stress work environment (defined as a being free of fast-paced or team-dependent production requirements and involving simple work-related decisions, occasional independent judgment skills, and occasional workplace changes). Tr. at 82–83. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 83. The ALJ asked whether there were any other jobs that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of

15

two as a cashier II, *DOT* number 211.462-010, with 2,800,000 positions in the national economy; a storage facility rental clerk, *DOT* number 295.367-026, with 431,000 positions in the national economy; and a mail clerk, *DOT* number 209.687-026, with 99,000 positions in the national economy. Tr. at 84.

The ALJ next asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first hypothetical question, except that he would be able to perform sedentary work, as opposed to modified light work. *Id.* The VE identified sedentary jobs with an SVP of two as a document preparer, *DOT* number 249.587-018, with 2,800,000 positions in the national economy; an egg processor, *DOT* number 559.687-034, with 218,000 positions in the national economy; and a charge account clerk, *DOT* number 205.367-014, with 191,000 positions in the national economy. Tr. at 84–85.

For a third hypothetical question, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first hypothetical question, but would require a handheld assistive device to ambulate. Tr. at 85. He further indicated the individual could lift and carry up to the maximum weight for sedentary work with the collateral arm, except when using stairs. *Id.* He stated the individual would not require a handheld assistive device for standing at the work station. *Id.* The VE responded that the jobs identified in response to the first hypothetical question would accommodate the additional restriction. Tr. at 86. The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the second question, but who had additional restrictions as set forth in the

third question. *Id.* The VE indicated the individual could perform the jobs identified in response to the second hypothetical question, as well. Tr. at 86–87.

For a fourth hypothetical question, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who would be limited as described in the prior questions, but would be off task for 25 percent of an average workday, in addition to normal breaks, and would be absent from work an average of three or more days per month. Tr. at 87. The VE indicated that the additional restrictions would not allow for performance of any work. Tr. at 88.

Plaintiff's attorney asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the third hypothetical question, but would require an option to alternate positions between sitting and standing at his own choosing for periods of at least 15 minutes at a time. Tr. at 89. The VE testified that the additional restriction would not affect the individual's ability to perform the jobs previously identified because the jobs typically provided the opportunity to alternate between sitting and standing at will. *Id.*

Plaintiff's attorney asked the VE to indicate the implication if the hypothetical individual were limited to standing and walking for two hours per day, but would require the ability to alternate between sitting and standing at will. *Id.* The VE stated the jobs identified in response to the prior questions could still be performed. *See* Tr. at 91–93.

2.      The ALJ's Findings

In his decision dated October 14, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
2. The claimant has not engaged in substantial gainful activity since September 19, 2012, the alleged onset date (20 CFR 404.1571, *et seq.*, and 416.971, *et seq.*).
3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; degenerative joint disease of the right shoulder; hypertension; sleep disorder; obesity; and status-post lumbar vertebrae, pelvic, and lower extremity fractures (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. The claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except that standing and walking combined can be performed for a total of 4 hours in an 8-hour workday; however, sitting can be performed for 6 hours out of an 8 hour workday; the claimant can never climb ropes, ladders, or scaffolds; he can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl; he can frequently balance; right overhead reaching can be performed occasionally; he can occasionally be exposed to extreme cold or to hazards such as unprotected dangerous machinery or unprotected heights; he can understand, remember, and carry out simple routine tasks in a low-stress environment (defined as free of fast-paced or team-dependent production requirements), involving simple work-related decisions, occasional independent judgment skills, and occasional workplace changes.
6. The claimant is unable to perform any of his past relevant work (20 CFR 404.1565 and 416.965).
7. The claimant was born on March 1, 1968, and was 44 years old, which is defined as a younger individual aged 18–49, on the alleged onset date (20 CFR 404.1563 and 416.963).
8. The claimant has a limited education, and he is able to communicate in English (20 CFR 404.1564 and 416.964).
9. Transferability of job skills is not material to the determination of disability, because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not he has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 19, 2012 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 27–34.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ erred in relying on the VE's opinion; and

2) the Appeals Council erred in declining to remand the case to the ALJ for consideration of new and material evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability

claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520 and § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b) and § 416.920(a), (b); Social Security

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525 and § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii) and § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526 and § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h) and § 416.920(h).

Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.     Analysis

           1.     Conflict Between VE's Testimony and *DOT*

Plaintiff argues the ALJ erred in relying on the VE's testimony to find that he was capable of performing jobs that existed in significant numbers. [ECF No. 10 at 20]. He maintains that the GED reasoning levels in the *DOT*'s descriptions of the jobs the VE identified were not consistent with the restriction in the RFC assessment to simple, routine tasks. *Id.* at 20–22. He contends that the ALJ did not identify and obtain an explanation for the conflict as required by SSR 00-4p. *Id.* at 23–24.

The Commissioner argues that because the jobs identified by the VE have SVPs of one and two, no conflict exists between the VE's testimony and the *DOT*'s job descriptions. [ECF No. 11 at 7]. She maintains that this case is distinguishable from

*Henderson v. Colvin*, 643 F. App'x 273, 277 (4th Cir. 2016), because the ALJ in the instant case imposed different mental restrictions and, unlike the ALJ in *Henderson*, he did not impose mental limitations because of a mental impairment. *Id.*

At the fifth step in the sequential evaluation process, "the Commissioner bears the burden to prove that the claimant is able to perform alternative work." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015), citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). In assessing the claimant's ability to perform other jobs existing in significant numbers in the national economy, the ALJ should take administrative notice of job information contained in the *DOT*. 20 C.F.R. § 404.1566(d) and § 416.966(d); *see also* SSR 00-4p (providing that "we rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy"). In some cases, ALJs obtain testimony from VEs to address how certain restrictions affect claimants' abilities to perform specific jobs. 20 C.F.R. § 404.1566(e) and § 416.966(e).

Recognizing that VEs' opinions sometimes conflict with the information in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved. The Fourth Circuit recently explained that the "purpose" of SSR 00-4p "is to require the *ALJ* (not the vocational expert) to '[i]dentify and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the *Dictionary*, and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.'" *Pearson*, 810 F.3d at 208, citing SSR 00-4p (emphasis in original). The court noted that SSR 00-4p sets forth two independent responsibilities. *Id.* "First, the ALJ must '[a]sk the [vocational expert] . . . if the evidence he or she has provided conflicts with the

23

information provided in the [*Dictionary*]'; and second, '[i]f the [vocational expert]'s . . . evidence appears to conflict with the [*Dictionary*],' the ALJ must 'obtain a reasonable explanation for the apparent conflict.[5]'" *Id.* at 208, citing SSR 00-4p. "SSR 00-4p directs the ALJ to 'resolve the conflict by determining if the explanation given by the [expert] is reasonable'" and "to 'explain the resolution of the conflict *irrespective of how the conflict was identified*.'" *Id.* at 208, citing SSR 00-4p (emphasis in original). Thus, "[t]he ALJ independently must identify conflicts between the expert's testimony and the *Dictionary*." *Id.* at 209. Furthermore, "an ALJ has not fully developed the record if it contains an unresolved conflict between the VE's testimony and the *DOT*" and "an ALJ errs if he ignores an apparent conflict on the basis that the VE testified that no conflict existed." *Henderson*, 643 F. App'x at 277, citing *Pearson*, 810 F.3d at 210.

In *Henderson*, 643 F. App'x at 277, the court explained that "[u]nlike GED reasoning Code 1, which requires the ability to '[a]pply commonsense understanding to carry out simple one-or-two-step instructions,' GED Reasoning Code 2 requires the employee to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" *Id.*, citing *DOT*, 1991 WL 688702 (2008); *Rounds v. Comm'r*, 807 F.3d 996, 1003 (9th Cir. 2015) (holding that reasoning code two requires additional reasoning and understanding above the ability to complete one-to-two step tasks). The court acknowledged that "there is an apparent conflict between an RFC that limits [a claimant] to one-to-two step instructions and GED reasoning Code 2, which

---

[5] The court explained that an "apparent conflict" existed when the VE's evidence "appear[ed] to conflict with the *Dictionary*." *Pearson*, 810 F.3d at 209.

requires the ability to understand detailed instructions." *Id.* Accordingly, the court found that the ALJ failed to meet his burden at step five because the VE's testimony did not provide substantial evidence to show that the plaintiff's RFC would allow him to perform work that existed in significant numbers. *Id.* at 277; *Pearson*, 810 F.3d at 207–10. Although *Henderson* is an unpublished opinion, this court has applied its holding in subsequent cases. *See Christopherson v. Colvin*, No. 6:15-4725-JMC-KFM, 2016 WL 7223283, at *9 (D.S.C. Nov. 18, 2016); *Sullivan v. Colvin*, No. 8:16-79-JMC-JDA, 2016 WL 7228854, at *10 (D.S.C. Nov. 10, 2016).

In the instant case, the ALJ asked the VE to notify him of and provide a basis for any conflicts between his testimony and the information contained in the *DOT*. *See* Tr. at 81. While the ALJ asked the VE about elements of his opinion that were not addressed in the *DOT* and the VE confirmed that he was supplementing the information in the *DOT* with his professional experience, literature, and discussion with other VEs, neither the ALJ nor the VE identified any conflict between the jobs the VE identified and the mental restrictions in the RFC assessment. *See* Tr. at 88 (questioning whether the VE's "testimony involving time off task, absenteeism, the use of a cane, the bifurcation and demarcation of reaching, and by that I mean the division of reaching between left and right and then demarking [phonetic] between overhead and other levels of reaching, and also I guess this breakdown between sitting and standing at the light level" were directly addressed in the *DOT*).

In his decision, the ALJ limited Plaintiff to understanding, remembering, and carrying out "simple routine tasks in a low-stress environment (defined as free of fast-

paced or team-dependent production requirements), involving simple work-related decisions, occasional independent judgment skills, and occasional workplace changes." Tr. at 30. These were the same mental restrictions the ALJ included in his hypothetical question to the VE during the hearing. *See* Tr. at 82–83. Based on the VE's testimony, the ALJ found Plaintiff was capable of performing jobs as a cashier II, a storage facility rental clerk, a mail clerk, a document preparer, an egg processor, and a charge account clerk. Tr. at 33. The job of egg processor has a GED reasoning level of two. 559.687-034, EGG PROCESSOR. *DOT* (4th ed., revised 1991), 1991 WL 683787. The jobs of charge account clerk, cashier II, storage facility rental clerk, mail clerk, and document preparer have GED reasoning levels of three. 205.367-014, CHARGE-ACCOUNT CLERK. *DOT* (4th ed., revised 1991), 1991 WL 671715; 211.467-010, CASHIER, COURTESY BOOTH. *DOT* (4th ed., revised 1991), 1991 WL 671848; 295.367-026, STORAGE-FACILITY RENTAL CLERK. *DOT* (4th ed., revised 1991), 1991 WL 672594; 209.687-026, MAIL CLERK. *DOT* (4th ed., revised 1991) 1991 WL 671813; 249.587-018. DOCUMENT PREPARER, MICROFILMING. *DOT* (4th ed., revised 1991), 1991 WL 672349.

The RFC assessment in the instant case is similar to that in *Henderson*, 643 F. App'x at 276, in that both limited the plaintiffs to simple tasks in low-stress environments, but it differs from that in *Henderson* in that the ALJ declined to indicate how many steps Plaintiff was capable of performing. It is more akin to the RFC assessment in *Christopherson*, 2016 WL 7223283, at *8, which limited the plaintiff to "simple, routine, and repetitive tasks," but the ALJ did not specify that Plaintiff was

limited to repetitive tasks. *See* Tr. at 30 (allowing for simple work-related decisions, occasional independent judgment skills, and occasional workplace changes). Nevertheless, the similarities between the cases suggest that an apparent conflict exists between the *DOT*'s descriptions of the jobs the VE identified and the limitations included in the RFC assessment.

A closer examination of the GED reasoning levels further supports the existence of an apparent conflict. The *DOT* specifies that jobs with a GED reasoning level of one require workers to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *DOT*, 1991 WL 688702 (2016). Jobs with a GED reasoning level of two require workers to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* Jobs with a GED reasoning level of three require workers to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in and from standardized situations." The RFC assessment appears to be more consistent with GED reasoning level one than two or three. The abilities to perform simple tasks and to make simple work-related decisions in the RFC assessment are similar to the provision for applying commonsense understanding to carry out simple instructions at GED reasoning level one. *Compare* Tr. at 30, *with DOT*, 1991 WL 688702 (2016). The need for routine tasks and a low-stress environment in the RFC assessment are consistent with

27

the provision for standardized situations at GED reasoning level one. *Compare* Tr. at 30, *with DOT*, 1991 WL 688702 (2016). The restriction in the RFC assessment for occasional independent judgment skills and occasional workplace changes are akin to GED reasoning level one's provision for occasional or no variables from standard job situations. *Compare* Tr. at 30, *with DOT*, 1991 WL 688702 (2016). In contrast, the *DOT*'s descriptions of GED reasoning levels two and three indicate these jobs require more detail and variables than the RFC assessment describes. In light of the foregoing, the undersigned recommends the court find that an apparent conflict existed between VE's testimony and the *DOT*'s descriptions of the identified jobs.

The Commissioner argues that the instant case is distinguishable from *Henderson* because Henderson's mental restrictions were based on his diagnosis of borderline intellectual functioning and Plaintiff's mental impairments were based on his complaints of pain and the side effects of his medication. Although the instant case may be differentiated from *Henderson* for that reason, the Commissioner has failed to direct the court to any cases that suggest apparent conflicts between the VE's testimony and the *DOT* should be considered differently if mental restrictions result from a mental impairment, as opposed to pain or side effects of medication. Furthermore, the undersigned notes that the instant case is similar to *Christopherson*, where the court found remand necessary based on a conflict between jobs having GED reasoning codes of two and three and mental restrictions to "simple, routine, and repetitive tasks" that were imposed based on complaints of pain and side effects of medication. *Compare* Tr. at 32 ("evidence received at [hearing] level demonstrates the need to limit the claimant to

simple routine tasks (as outlined in the above RFC) based on the effects of pain and medications on the claimant's concentration, attention and pace"), with *Christopherson*, 2016 WL 7223283, at *8 ("the ALJ limited the plaintiff to 'simple, routine, and repetitive tasks' and noted that 'this is due to the side effects of medications, and in giving the claimant the benefit of the doubt as to complaints of pain; it is not due to any established or alleged mental impairments'"). Therefore, the undersigned rejects the Commissioner's argument.

The Commissioner argues no conflict existed between the VE's testimony and the *DOT* because the VE identified jobs with an SVP of two. The court rejected this argument in *Pearson v. Commissioner of Social Security Administration*, No. 1:16-2726-PMD-SVH, 2017 WL 1378197 (D.S.C. Mar. 29, 2017), adopted by 2017 WL 1364220 (D.S.C. Apr. 14, 2017). It noted that "[t]he SVP level in a *DOT* listing is focused on the amount of lapsed time it takes for a typical worker to learn the job's duties," but the GED reasoning level "gauges the minimal ability a worker needs to complete the job's tasks themselves." *Id*. at *13, citing *Snider v. Colvin*, No. 7:12-539, 2014 WL 793151, at *8 n.5 (W.D. Va. Feb. 26, 2014). Thus, the factors necessary to a determination of SVP are not the same as those required for a determination of GED reasoning level, and the absence of conflict between the *DOT* and the VE's testimony with respect to one does not ensure that there will be no conflict with respect to the other.

Because the ALJ relied on the VE's testimony without having identified and resolved the apparent conflict between it and the *DOT*, substantial evidence does not support his finding that Plaintiff was capable of performing work as a cashier II, a storage

facility rental clerk, a mail clerk, a document preparer, an egg processor, and a charge account clerk. *See Pearson*, 810 F.3d at 210; *Henderson*, 643 F. App'x at 277. In light of the foregoing, the undersigned recommends the court find the Commissioner failed to meet her burden at step five.

### 2.  New Evidence Submitted to Appeals Council

Plaintiff submitted to the Appeals Council a narrative from Dr. LeBlond dated September 26, 2016. Tr. at 704. Dr. LeBlond stated he had first treated Plaintiff in 2004 for back and leg pain, but that Plaintiff had returned for treatment on December 10, 2012, following his MVA and hospitalization. *Id.* He indicated Plaintiff's injuries included fractures to his left femur, right pelvis, left wrist, left great toe, left tibial plateau, several vertebral processes, and multiple ribs. *Id.* He noted Plaintiff had undergone ORIF of acetabular and tibial plateau fractures and intermedullary nailing of the left femur. *Id.* He stated Plaintiff had been discharged from his practice on June 4, 2014,[6] after he failed to report for a pill count because he had lost his health insurance. *Id.* He explained that Plaintiff had "trouble getting around" because of back and leg pain in June 2013 and continued to limp, have an altered gait, and complain of pain when standing in December 2013. *Id.* He stated Plaintiff had "difficulty walking for very long," complained of back pain with radiation to the right lower back and right leg, and was taking five pain pills per day in February 2014. *Id.* He noted that Plaintiff had reported his pain was "moderately

---

[6] The undersigned notes that the treatment visits Dr. LeBlond references for December 2013, February 2014, and June 2014 do not appear in the record. The last treatment note from Dr. LeBlond's office that appears in the record is dated November 22, 2013. *See* Tr. at 678.

well controlled with medication" on June 4, 2014, but that his left foot was rotated out as if he were externally rotated for comfort; he walked with a cane and with a forward-flexed posture, as if he were in pain; he complained of pain in his hardware; he reported pain in his trochanteric bursa that was indicative of bursitis from altered gait; and he continued to take Norco. *Id.*

Dr. LeBlond indicated Plaintiff's condition during his last visit suggested "he would need to change positions between sitting and standing more often than 30 minutes"; was limited to sedentary work because of his limp and forward-flexed posture; and "would suffer constant interruptions to concentration sufficient to frequently interrupt tasks given his clinical examination and the amount of pain medication he was still taking." He stated Plaintiff had those restrictions during the time period he provided treatment. *Id.*

Plaintiff argues the Appeals Council erred in failing to remand the case to the ALJ for consideration of Dr. LeBlond's opinion. [ECF No. 10 at 24]. He maintains that the ALJ was likely to consider Dr. LeBlond's opinion to be probative because he had indicated his decision was influenced by the absence of an opinion from a treating source regarding Plaintiff's disability status or functional capacity. *Id.* at 26.

The Commissioner argues that Dr. LeBlond's letter was not new because Plaintiff could have requested it prior to the ALJ's decision. [ECF No. 11 at 8]. She maintains that Dr. LeBlond's opinion does not fill an evidentiary gap because, even if it were given controlling weight, the VE's testimony suggests that it would not have precluded all work. *Id.* at 10.

A claimant may submit additional evidence that was not before the ALJ at the time of the hearing, along with a request for review of the ALJ's decision. *Meyer v. Astrue,* 662 F.3d 700, 705 (4th Cir. 2011), citing 20 C.F.R. § 404.967. However, the evidence must be both "new" and "material" and the Appeals Council may only consider the additional evidence "where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b) and § 416.1470(b) (effective February 9, 1987 to January 16, 2017).[7] If new and material evidence is offered and it pertains to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. *Id.* After reviewing the new and material evidence and all other evidence of record, the Appeals Council will either issue its own decision or remand the claim to the ALJ if it concludes that the ALJ's "action, findings, or conclusion" was "contrary to the weight of the evidence." *Meyer*, 662 F.3d at 705, citing 20 C.F.R. § 404.970(b). However, if after considering all the evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were supported by the weight of the evidence, the Appeals Council will deny review and is not obligated to explain its rationale. *Id.* at 705–06.

"In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with

---

[7] A change to 20 C.F.R. § 404.970(b) and § 416.1470(b) effective January 17, 2017, requires that claimants show good cause for failing to submit the evidence earlier and specifies reasons that support a finding of good cause. However, because the Appeals Council reviewed this case prior to January 17, 2017, the prior versions of 20 C.F.R. § 404.970(b) and § 416.1470(b) apply, and Plaintiff was not required to show good cause for having failed to submit the evidence to the ALJ.

the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the agency's decision where "substantial evidence support[ed] the ALJ's findings." *Id.*, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996). However, if a review of the record as a whole shows the new evidence supported Plaintiff's claim and was not refuted by other evidence, the court should reverse the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Secretary, Department of Health and Human Services*, 953 F.3d 93, 96 (4th Cir. 1991). If the addition of the new evidence to the record does not allow the court to determine whether substantial evidence supported the ALJ's denial of benefits, the court should remand the case for further fact finding. *Id.*

Although the Commissioner argues Dr. LeBlond's opinion was not new evidence because Plaintiff could have obtained it prior to the ALJ's decision, the Appeals Council accepted it as new and material. *See* Tr. at 5 (indicating "Medical evidence from Robert LeBlond, M.D., dated September 26, 2016 (1 page)" was exhibited as part of the record); *see also Benton v. Colvin*, No. 1:15-4859-BHH, 2016 WL 7367298, at *4 (noting that the Appeals Council conceded that the evidence was new and material by accepting it into the record). The Appeals Council indicated in its decision that it had considered the evidence, but found that it did "not provide a basis for changing the Administrative Law Judge's decision." Tr. at 2.

Contrary to the Commissioner's assertion, the VE did not indicate Plaintiff could perform jobs if he were limited as described in Dr. LeBlond's statement. Neither the ALJ nor Plaintiff's attorney presented the VE with a hypothetical question that included a provision for constant interruptions to concentration and task performance.[8] *See generally* Tr. at 81–95.

In *Meyer*, 662 F.3d at 707, the court found that the Appeals Council erred in failing to remand the case to the ALJ for consideration of the plaintiff's treating physician's opinion. The court noted that "[t]he ALJ emphasized that the record before it lacked 'restrictions placed on the claimant by a treating physician,' suggesting that this evidentiary gap played a role in its decision." *Meyer*, 662 F.3d at 707. Similar to *Meyer*, the ALJ in the instant case noted that "no treating source ha[d] expressed an opinion regarding the claimant's functional capacity or on the ultimate issue of disability." Tr. at 32. He further indicated that Plaintiff had not attended any consultative examinations. *Id.* While the ALJ did not specify that his decision had been influenced by an evidentiary gap, his acknowledgment of the limited evidence in the record suggests that an evidentiary gap was relevant to his evaluation of the evidence.

The ALJ gave "significant weight" to the opinions of the state agency medical consultants and "persuasive weight" to the state agency psychologist, finding that they were generally "consistent with the overall medical evidence," but that subsequent

---

[8] The ALJ asked the VE to assume the hypothetical individual would be off task an average of 25 percent of the workday beyond normal breaks and would be absent from work an average of three or more days per month, and the VE responded that those two limitations would preclude all work. *See* Tr. at 87–88.

evidence indicated "the need for greater standing and walking limitations" and "the need to limit the claimant to simple routine tasks." *Id.* Dr. LeBlond indicated Plaintiff's abilities to stand, walk, and maintain concentration were more significantly limited by his impairments, pain, and medication than the ALJ provided in the RFC assessment. *See* Tr. at 704. While Dr. LeBlond indicated Plaintiff had greater limitations than those the ALJ included in the RFC assessment, it is unclear from the record whether the ALJ would have assessed the same restrictions or greater restrictions if he had reviewed Dr. LeBlond's statement and the additional evidence that he referenced in his opinion.

Dr. LeBlond's opinion is not unrefuted by all the other evidence of record, but it is probative enough that it requires consideration by the finder of fact. *See Turner*, 2015 WL 751522, at *5. Therefore, the undersigned recommends the Court find the Appeals Council erred in declining to remand the case to the ALJ for consideration of Dr. LeBlond's opinion.

## III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

September 12, 2017
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).